# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES FIDELITY &
GUARANTY COMPANY,

                Plaintiff,

-vs-                                         Case No.  6:06-cv-1180-Orl-31UAM

LIBERTY SURPLUS INSURANCE
CORPORATION and UNITED STATES
FIRE INSURANCE COMPANY,

                Defendants.
_____

LIBERTY SURPLUS INSURANCE
CORPORATION,
            Third Party Plaintiff,
vs.

ALLEN IRONWORKS, INC., AEICOR
METAL PRODUCTS, INC., MENDOZA
PAINTING LLC, MEL HAYES
PAINTING, INC., MOSS
WATERPROOFING & PAINTING CO.,
INC., FARRIS GYPSUM FLOORS OF
FLORIDA INC., ST. PAUL TRAVELERS,
COMMERCIAL UNION INSURANCE
COMPANY, AMERISURE INSURANCE
COMPANY AND AUTO-OWNERS
INSURANCE COMPANY,

        Third Party Defendants.

_____

## ORDER

This cause came on for consideration without oral argument on the following motion:

<table>
<tr><td><strong>MOTION:</strong></td><td><strong>MOTION FOR THE RETURN OR DESTRUCTION OF INADVERTENTLY DISCLOSED PRIVILEGED DOCUMENTS (Doc. No. 176)</strong></td></tr>
<tr><td><strong>FILED:</strong></td><td><strong>July 12, 2007</strong></td></tr>
</table>

<strong>THEREON</strong> it is <strong>ORDERED</strong> that the motion is <strong>DENIED</strong>.

I.    **STATEMENT OF FACTS**

On May 14, 2007, Plaintiff, United States Fidelity & Guaranty Company ("USFG") propounded its request for production of documents to Defendant Liberty Surplus Insurance Corp. ("Liberty"). On May 17, 2007, Liberty's counsel, Dorothy Venable DiFiore, requested a thirty day extension of time "to respond to the discovery." Doc. 204-2 at 1. USFG agreed to extend Liberty's deadline to July 1, 2007. *Id.* DiFiore stated that she thought the extension "would be more than adequate." *Id.*

Subsequent to securing the extension of time, DiFiore claims that she had multiple e-mail communications with USFG's counsel, Alberta ("Ali") Adams, in which she discussed "issues of privileged communications regarding claims handling matters and privileges related to the contents of the claims file. . . ." Doc. 204-3 at ¶ 9. DiFiore has not produced any of these communications for the Court's review. USFG, however, produced to the Court an e-mail dated June 22, 2007, from DiFiore to Adams in which DiFiore states Liberty will produce some of the materials from the claims file as they are not privileged, and that she will provide a privilege log "in the next few days" as to the documents withheld from production. Doc. 229-2. DiFiore further claims that she had a telephone conversation with Adams on June 27, 2007, in which she discussed the issue of privileges related to

claims file material and claims handling activities, although she is unable to state the "exact content" of that conversation.  Doc. 204-3 at ¶¶ 10, 11.

On June 29, 2007, Liberty produced documents in response to USFG's request.  Doc. 179 at ¶ 18.  The documents were accompanied by a letter stating what was being produced.  Doc. 179 at ¶ 19.  The production, however, was not accompanied by the written response required by Fed. R. Civ. P. 34(b), or a privilege log.  Liberty served a privilege log on July 3, 2007.  Doc. 178 ¶ 17.  Liberty served the written response required by Fed. R. Civ. P. 34(b) on July 6, 2007.  Doc. 180 at 5.

After receiving the privilege log, on July 5, 2007, USFG informed Liberty that it appeared that Liberty had produced documents that were listed on the log.  Doc. 178 at ¶ 5.  Liberty's counsel immediately asserted that any production of any of the documents on the privilege log was unintentional.  Doc. 178 at ¶ 20.  The following day, Liberty's counsel met with USFG's counsel and specifically identified the erroneously produced documents.  Doc. 178 at ¶ 22.  USFG has sequestered those documents from the others and has not reviewed the documents.  On July 12, 2007, Liberty filed its motion for the return or destruction of the inadvertently disclosed privileged documents.

## II.     THE LAW

### A.      Attorney-Client Privilege

Pursuant to Fed. R. Evid. 501, "the privilege of a witness, person . . . shall be determined in accordance with State law."  Precedential authority in the Eleventh Circuit has interpreted Fed. R. Evid. 501 to require application of the law of the "forum state" when assessing the availability of a privilege in a diversity case.  *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980).

Liberty initially stated that it was unclear whether Massachusetts law, Florida law or federal law governed the analysis of attorney-client privilege in this case. Doc. 176 at 9 n.3. When the Court ordered supplemental briefing to address *inter alia* what is the applicable law for determining privilege, Liberty argued that the underlying contract is governed by Massachusetts law and, therefore, Massachusetts' privilege law should be used. Doc. 204 at 7-9. USFG contends that Florida substantive law applies and that Florida's law applies to determine attorney-client privilege. Doc. 229 at 8-9.

While USFG contests whether certain documents are privileged under the attorney work product doctrine, USFG does not make the same argument regarding the attorney-client privilege. Doc. 180 at 7-10. As the Court understands USFG's arguments, USFG does not claim that the documents are not subject to the attorney-client privileged, but rather claims that the privilege has been waived. Doc. 180 at 10-15. USFG argues that the law of waiver of privilege is the same under both Massachusetts and Florida law. Doc. 229 at 9.

The Court finds that in cases involving inadvertent disclosure of privileged communications, both Florida and Massachusetts apply standards that require the Court to assess the reasonableness of precautions taken to preserve the privilege. *See, In the Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd (Bermuda)*, 425 Mass. 419, 422, 681 N.E. 2d 838, 841 (Mass. 1997); *Abamar Housing & Dev. v. Lisa Daly Lady Decor, Inc.*, 698 So.2d 276, 278-79 (Fla. 3d App. Dist. 1997).[1]

---

[1] USFG cites among its authorities *Ray v. Cutter Labs., Div. of Miles, Inc.*, 746 F. Supp. 86, 88-89 (M.D. Fla. 1990), which concluded that Florida follows the traditional rule of waiver. This Court respectfully disagrees with that particular conclusion. The *Ray* court relied on the statement in *Hamilton v. Hamilton Steel Corp.*, 409 So.2d 1111, 1114 (Fla. 1982), that "[i]t is black letter law that once the privilege is waived, and the horse is out of the barn, it cannot be reinvoked." *Ray*, 746 F. Supp. at 88. The *Hamilton* case, however, involved an attorney's intentional statement in open court regarding a settlement and then an attempt to claim privilege to avoid explaining inconsistencies regarding the settlement. 409 So. 2d at 1114. This Court finds that it stretches *Hamilton* too far to find that the traditional rule of waiver applies to a case of inadvertent disclosure.

-4-

The Court, therefore, does not need to engage in a choice of law analysis to resolve this motion. Under the modern approach followed by Florida and Massachusetts courts, the Court should consider the following circumstances in determining whether inadvertent disclosure results in a waiver of the attorney-client privilege:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice.

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 291 (D. Mass. 2000).

## B.    Attorney Work Product

The attorney work product doctrine is determined based on federal law. *Auto Owners Ins. Co. v. Totaltape, Inc.*, 135 F.R.D. 199, 201 (M.D. Fla. 1990). The attorney work product doctrine protects trial preparation materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths and weaknesses, and inferences drawn from interviews. Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). Work product protection applies to "documents and tangible things . . . prepared in anticipation of litigation or for trial" by or on behalf of a party. Fed. R. Civ. P. 26(b)(3). If documents and materials are produced in the ordinary course of business or other non-litigation purposes, they do not qualify as work product. *See, Advisory Committee Notes to Rule 26(b)(3)*. The party asserting the privilege has the burden of proving the existence of the privilege. *See, United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1991) (attorney-client privilege);

---

*See, Kusch v. Ballard*, 645 So.2d 1035, 1039 (Fla. 4th App. Dist. 1994) (Stevenson J., concurring in part, dissenting in part) ("I believe that the federal district court reads far too much in *Hamilton* to reach its conclusion that under Florida law, and inadvertent disclosure, by someone other than the client, amounts to a waiver of the attorney-client privilege. . . .[I]t is quite apparent that *Hamilton* does not address the specific issue of inadvertent disclosure by counsel of attorney-client information because the disclosure by counsel in *Hamilton* was clearly voluntary and intentional.").

*Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042 (10th Cir. 1998) ("the party asserting work product privilege has the burden of showing the applicability of the doctrine"); *Binks Mfg. Co. v. Nat'l Presto Indus.*, 709 F.2d 1109, 1119 (7th Cir.1983) ("the party seeking to assert the work product privilege has the burden of proving that 'at the very least some articulable claim, likely to lead to litigation, [has] arisen.'" (citations omitted)); *Conoco Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 730 (3d Cir. 1982) ("the party asserting work product protection has the burden of demonstrating that the documents were 'prepared in anticipation of litigation'").

## III.   ANALYSIS

### A.   Whether Challenged Communications Constitute Work Product

USFG argues that communications between Patrice Williams and Jamie Moray do not qualify as work product as neither person is an attorney, and the communications pre-date Liberty's revocation of its defense of Callahan's claim.  USFG also argues that the report prepared by Engle Martin, the adjusting firm that Liberty hired to investigate Callahan's claim and to represent Liberty in the mediation, does not qualify as work product.

The mere possibility that a certain event might lead to future litigation does not render privileged all documents prepared subsequent to that event. *City of Worcester v. HCA Mgmt. Co., Inc.*, 839 F. Supp. 86, 88 (D. Mass. 1993).  The determinative question is whether the prospect of litigation was the primary motivating purpose behind the creation of a particular document. *Id.*

The work product doctrine was not intended to protect from general discovery materials prepared in the ordinary course of business such as factual investigations prepared by insurance companies. *Cutrale Citrus Juices USA, Inc. v. Zurich Am. Ins. Group,* 2004 WL 5215191 *2 (M.D.

Fla. September 10, 2004) (citing *Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Co.*, 123 F.R.D. 198, 202 (M.D.N.C.1988)).  Most courts have held that documents constituting any part of a factual inquiry into or evaluation of a claim, undertaken in order to arrive at a claim decision, are produced in the ordinary course of an insurer's business and, therefore, are not work product.  *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 662 (S.D. Ind. 1991). While there is no bright line rule in the insurance context marking the boundary between documents protected under the work product privilege and documents produced in the ordinary course of business, the date coverage is denied by the insurer has been recognized by a number of courts as the proper date after which it is fairly certain there is an anticipation of litigation and thus documents generated after that date would be protected as work product.  *Id.*

Liberty argues that at the time of the communications with Engle Martin, it had denied coverage.  Doc. 176 at 14.  Liberty then contradicts itself and states that they were defending the claim under a reservation of rights.  *Id.*  As shown by the attachments to USFG's response, Liberty has altered its position several times regarding coverage.  From January 10, 2005, to March 3, 2005, Liberty agreed to defend the claim pursuant to a reservation of rights.  Doc. 180, Ex. A, B.  From March 4, 2005, to August 1, 2005, Liberty revoked the defense and denied coverage.  Doc. 180, Ex. B, C.  On August 2, 2005, Liberty again agreed to defend the case under a reservation of rights.  Doc. 180-4, Exh. C.  Liberty did not finally deny coverage until February 9, 2006.  Doc. 180-5, Exh. D.

Defending a claim under a reservation of rights is not the same as denying coverage.  *Cf., Steadfast Ins. Co. v. Sheridan Children's Healthcare Services, Inc.,* 34 F.Supp.2d 1364, 1366 (S.D. Fla.1998) (insurer "may investigate the claim under a reservation of rights and then withdraw its

defense and deny coverage, if its investigation reflects a good faith basis for doing so"). During those time periods when Liberty was defending under a reservation of rights, any documents were presumptively prepared in the ordinary course of business. It was not until Liberty finally denied coverage on February 9, 2006, that it can be said that litigation was anticipated.

### 1.   Williams/Moray Communications

There are two communications between Williams and Moray to which Liberty asserted only a work product objection, one e-mail dated January 11, 2006 and another dated February 13, 2006.[2] Liberty's privilege log does not identify either of these individuals, nor does its motion. A review of the documents submitted under seal reveal that Williams is a claims specialist with Liberty and Moray is a Claims Manager. Liberty 0402, 0408. The January 11, 2006, e-mail is authored by Williams and describes her goals regarding settlement, including the amount she intended to seek in settlement authority and timing of any settlement. Liberty 0402. She also suggests forwarding a particular issue to coverage counsel "for handling." Liberty 0402. The February 13, 2006, e-mail chain purports to forward an opinion letter dated February 3, 2006 (which was not attached to the document submitted under seal), and includes Williams' request from her manager for a copy of a document and question of her manager about what information she should include when disclaiming. Liberty 0416.

Liberty presents no argument in its motion why these particular documents are protected by attorney work product. There is no showing that the documents reflect the work product of any attorney. At best, the January 11, 2006 email reflects an inquiry by a subordinate employee of her manager whether a legal opinion should be obtained. In January 2006, Liberty was still defending the

---

[2] Although the documents filed under seal are numbered, the privilege log does not set forth the number of the documents at issue.

claim under a reservation of rights and Williams' question whether legal advice should be obtained on a particular issue does not demonstrate that litigation was likely at this time. Further, although Williams' email to her manager was after the date that Liberty declined coverage, nothing in the document reflects attorney work product. The Court concludes that the two documents reflecting communications between Williams and Moray are not protected by the attorney work product doctrine.

### 2.   Engle Martin Report

As to the "Engle Martin report," the privilege log identifies a nine page "email with report attached" between Williams and Engle Martin dated December 7, 2005, to which Liberty asserts both attorney-client and work product privileges. The accuracy and adequacy of Liberty's privilege log is clearly an issue, notably as Liberty states it voluntarily disclosed correspondence dated December 7, 2005, from Matthew Lohmann (of Engle Martin) to Williams. Doc. 176 at 14 n.4.[3] After reviewing the documents submitted under seal, the Court has been unable to identify Engle Martin's report. There is an e-mail dated December 7, 2005, from John Luna, Administrative Support with Engle Martin to Patrice Williams that references an attached report dated November 30, 2005 (Liberty0393), but the report itself does not follow,[4] nor did the Court locate it elsewhere in the sealed documents.

Liberty's motion asserts that Engle Martin was retained to attend mediation and investigate

---

[3] Indeed, the privilege log typically fails to identify the specific individual with Engle Martin who is the author or recipient of communications. This is simply inadequate. *See, e.g., Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 664 (S.D. Ind. 1991) (requiring the log to list, for each separate document, the authors and their capacities, the recipients (including copy recipients) and their capacities, the subject matter of the document, the purpose for its production, and a detailed, specific explanation of why the document is privileged or immune from discovery).

[4] The Court notes a gap in the sequence of numbers of sealed documents produced, with numbers Liberty0394-0401 missing.

the claim on behalf of Liberty. Doc. 176. Liberty further contends that Engle Martin was not retained to investigate on behalf of John T. Callahan (the insured), because "Callahan was adequately represented by the law firm of Rubin and Rudman." Doc. 176. Liberty contends that Engle Martin was retained as part of the coverage investigation and, therefore, the communications were developed in anticipation of litigation concerning the denial for the Westlake claim. Doc. 176.

The documents submitted under seal, however, show that Liberty has blurred the lines of its relationship with Engle Martin. Liberty's initial contact with Engle Martin on August 25, 2005, included direction to contact "Rubin & Rudman attorney, Scott Aftuck." Liberty 0374, Liberty 0376. At this time, Liberty was defending Callahan under a reservation of rights. In Liberty's initial communications to Engle Martin, it is clear that Liberty sought to investigate the factual circumstances behind the claim. Further, given Liberty's directives regarding contacting the insured's attorney, it does not appear that Liberty intended the factual report to remain confidential.

Based on an e-mail dated November 22, 2005, by Patrice Williams to Engle Martin, Engle Martin had not yet provided the report and results of their investigation. Liberty0389. Nevertheless, at this time, Liberty altered the scope of services requested from Engle Martin to include representation of Liberty at the mediation on November 29, 2005, and to report to Liberty on their opinion regarding liability. *Id*.

As the only Engle Martin report provided was after the mediation, it is unclear whether the report includes both the factual investigation and the liability analysis. The Court notes that Engle Martin separately reported to Patrice Williams regarding the mediation in an e-mail dated December 1, 2005, stating that they are working on a "full report." Liberty 0390. At this time, however, Liberty

-10-

still had not finally denied coverage and the communications were presumptively prepared in the ordinary course of business.

It is Liberty's burden to establish that the applicability of any privilege.  Liberty has not produced the Engle Martin report to the Court for *in camera* review, nor does its motion or privilege log provide a sufficiently detailed explanation to establish that litigation was anticipated prior to the final denial of coverage.  Nor does Liberty provide any information to sustain its claim of attorney-client privilege as to the Engle Martin report.  The Court, therefore, finds that because Liberty has failed to sustain its burden of establishing privilege, the Engle Martin report is discoverable.

**B.     Waiver of Privileges**

Liberty argues that because it took adequate precautionary steps to protect the privilege, the inadvertent disclosure of documents did not result in a waiver of the privilege.  USFG contends that Liberty's actions were insufficient and that waiver of the privilege has occurred.  Using the five factors set forth in *Amgen*, the Court analyzes the waiver issue below.

**1.     The reasonableness of the precautions taken to prevent inadvertent disclosure**

Liberty had 48 days from the time when USFG served its request for production until the due date of July 1, 2007.  Liberty admits the amount of time was adequate.  On June 29, 2007, Liberty produced 1911 pages of documents, about 3/4 of a standard banker's box.  Doc. 180 at 4.  Within the production are 94 pages that Liberty claims are privileged and were inadvertently disclosed.  Doc. 180 at 6.

DiFiore, the attorney primarily responsible for the production of Liberty's documents, states that she had segregated documents by category, such as "arbitration materials," "expert reports," and

-11-

underwriting file.  Doc. 178 at ¶ 11.  DiFiore states that she instructed her paralegal to send out these materials for copying and delivery to USFG's counsel.  *Id*. at ¶¶ 8-9.  DiFiore further states that she told her paralegal that the correspondence, which was spread out on DiFiore's desk, would not be produced until after she had the opportunity to review it.  *Id*.  at ¶¶ 10, 12.  The paralegal misunderstood DiFiore's instructions and included "a loose stack of documents containing correspondence and emails" with the materials sent for copying.  Doc. 179 at ¶ 15.

As DiFiore and the other attorney responsible for the case were absent from the office when the production was due, the paralegal brought the cover letter that she prepared listing the documents to be produced to another firm attorney, Michael B. Stein.  Doc. 179 at ¶ 20, 21.  Stein had not previously worked on the case and had no knowledge about who the firm represented or the names of any persons involved in the litigation.  Doc. 177 at ¶ 4.  Stein nevertheless signed the cover letter. Doc. 177 at ¶ 5.  The documents were served with the cover letter, but without a written response asserting any privilege or a privilege log.

As a general rule, a responding party's failure to make a timely and specific objection to a discovery request waives any objection based on privilege.  *See, Krewson v. City of Quincy*, 120 F.R.D. 6, 7 (D. Mass.1988).  Fed. R. Civ. P. 34(b) requires the responding party to provide a *written* response, and Rule 26(b)(5) requires a party withholding information on the basis of privilege to make the claim expressly and to describe the nature of the documents sufficiently to enable other parties to assess the applicability of the privilege.  Liberty's verbal objections and statements do not fulfill the Rules' requirements.  Even if the Court does not apply an automatic waiver rule, Liberty's

failure to object timely in writing is strong evidence of a failure to take adequate precautions to protect the privilege.

As further evidence of its precautions, DiFiore states that the inadvertently produced documents were "spread out on the desk," unlike the documents to be produced, which were in labeled file folders.  Doc. 178 at ¶¶ 11-12.  In *Amgen*, the court found that segregation of privileged documents by placing them on a separate shelf from those to be produced falls short of demonstrating precautions intended to prevent inadvertent disclosure.  *Amgen*, 190 F.R.D. at 292.  In this case, leaving documents spread out on a desk risks disclosure to persons who are not privileged to see the documents, such as a janitorial employees.  Leaving documents in the open is inconsistent with taking reasonable precautions to protect the privilege.

Even though the paralegal may have misunderstood DiFiore's instructions, the paralegal brought the cover letter listing the documents to be produced to Stein.  It is no excuse that Stein had not previously worked on the file and did not know who was the firm's client.  It is clear that Stein did not even look at the documents that were being produced before he signed the letter.  Doc. 177. Had he done so, he would have seen that some of the documents state on their face that they are "privileged and confidential."  See Liberty 0322-0335; 0356-0361; 0362-0365; 0387-0388.  Other documents state that the document is an opinion letter.  See Liberty 0315-0321; 0337-0341; 0410-0414.  Seeing these phrases on a document would have placed any attorney on notice that production of the documents may constitute waiver of a privilege.  *See, Amgen*, 190 F.R.D. at 292 (having a knowledgeable attorney or paralegal review documents copied by an outside vendor before production is an "easily-accomplished additional precaution" that should be taken).

-13-

The Court finds that Liberty's counsel did not take reasonable precautions to prevent inadvertent disclosure of privileged documents.

### 2.   Amount of Time Taken to Discover the Error

Although DiFiore had the opportunity to discover the disclosure when she returned to her office on July 2, 2007, DiFiore did not review the paralegal's work done in her absence.  Doc. 178 at ¶ 16.  Liberty was unaware of the inadvertent disclosure until USFG's counsel brought it to counsel's attention on July 5, 2007.  Doc. 178 at ¶¶ 18-19.  This situation is similar to that in *Amgen*, where the producing party was unaware of its disclosure until five days later when the receiving party brought the disclosure to the attention of the producing party. *Amgen*, 190 F.R.D. at 293.

### 3.   Scope of the Production and the Extent of the Inadvertent Disclosure

As stated above, 34 documents consisting of 94 pages of the 1911 pages produced are allegedly privileged.  Thus, approximately 5% of the volume of documents produced are allegedly privileged.  In *Amgen,* the court found that a production of 200 privileged documents out of 3821 (approximately 5%) was "dramatic" in number.  *Amgen,* 190 F.R.D. at 293. *See also, Ray v. Cutter Labs., Div. of Miles, Inc.*, 746 F. Supp. 86, 88-89 (M.D.Fla. 1990) (the privilege was waived when a single document was included in a 157-page production).  It is not only the volume of documents that is a concern, but also the nature of the documents disclosed.  By producing opinion letters from coverage counsel, a significant disclosure has occurred.

-14-

**4.      Overriding Interests of Fairness and Justice**

The Court finds that the overriding interests of fairness and justice support a finding of waiver. Given the conduct of Liberty's counsel as it relates to the protection of the privilege, the Court finds it would be improper to relieve Liberty of the waiver. *See, Amgen*, 190 F.R.D. at 290 ("it would be unjust to reward such gross negligence [of counsel] by providing relief from waiver. In fact, if the Court does not hold that a waiver has occurred under the egregious circumstances here presented, it might as well adopt the 'never waived' rule").

**CONCLUSION**

The Court denies Liberty's motion for return or destruction of documents inadvertently produced. Further, although the Engle Martin report was not actually produced, it was identified on the privilege log as having been produced and the parties have had a full and fair opportunity to address the issue of privilege. The Court finds that it would be a waste of resources to require USFG to file a motion to compel production of the report under these circumstances. Liberty has failed to sustain its burden that the Engle Martin report is privileged and USFG is entitled to receive the report.

No later than **November 1, 2007**, Liberty shall produce to USFG a copy of the Engle Martin report. Additionally, provided there is no appeal of this ruling, the Court orders the Clerk to return to USFG's counsel the documents that they filed under seal.

**DONE** and **ORDERED** in Orlando, Florida on October 12, 2007.

*Donald P. Dietrich*

DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

-15-