**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES FIDELITY &**
**GUARANTY COMPANY,**

                **Plaintiff,**

**-vs-**                                                    Case No. 6:06-cv-1180-Orl-31UAM

**LIBERTY SURPLUS INSURANCE**
**CORPORATION and UNITED STATES**
**FIRE INSURANCE COMPANY,**

                **Defendants.**

**LIBERTY SURPLUS INSURANCE**
**CORPORATION,**
      **Third Party Plaintiff,**
**vs.**

**AEICOR METAL PRODUCTS, INC.,**
**MOSS WATERPROOFING & PAINTING**
**CO., INC., FARRIS GYPSUM FLOORS OF**
**FLORIDA INC., ST. PAUL TRAVELERS,**
**COMMERCIAL UNION INSURANCE**
**COMPANY, AND AUTO-OWNERS**
**INSURANCE COMPANY,**

                **Third Party Defendants.**

## ORDER

      This matter comes before the Court on the Motion for Summary Judgment (Doc. 227) filed by Third Party Defendant St. Paul Fire & Marine Insurance Company[1] ("St. Paul"), the response

---

[1] St. Paul Fire & Marine Insurance Company was incorrectly identified in the Second Amended Third Party Complaint (Doc. 170-2 ) as "St. Paul Travelers".

(Doc. 259) filed by Defendant/Third Party Plaintiff Liberty Surplus Insurance Corporation ("Liberty Surplus"), and the reply (Doc. 286) filed by St. Paul.

## I.     Background

Liberty issued two commercial general liability ("CGL") policies to John T. Callahan & Sons, Inc. ("Callahan"), which served as the general contractor for construction of a Florida apartment complex called the Westlake Apartments. St. Paul issued three primary general liability polices and two umbrella general liability policies (collectively, the "St. Paul Policies") to Farris Gypsum Floors of Florida, Inc. ("Farris"), one of Callahan's subcontractors on the Westlake project. After construction was completed, Westlake's owner initiated an arbitration proceeding against Callahan, complaining of alleged construction defects. Liberty declined to defend or indemnify Callahan. Callahan filed a third party claim against several of its subcontractors, including Farris, alleging that the subcontractors were ultimately responsible for any defects in the Westlake project.

In March 2006, Callahan and its surety, United States Fidelity & Guaranty Company ("USF&G"), settled the claims of Westlake's owner for approximately $8 million.[2] Subsequently, Farris's successor in interest and its liability insurer, St. Paul, reached a settlement with USF&G, Callahan and Westlake's owner. The settlement agreement included a mutual release of "all claims, cross-claims, actions, causes of action, ... damages, costs, attorneys' fees and expenses" incurred by Callahan, USF&G, and Westlake's owner "in any way related to (a) the subcontract

---

[2] By virtue of its payment to Westlake's owner, USF&G was subrogated to the position of Callahan against Liberty. In addition, USF&G received an assignment of the rights and claims of Callahan and Westlake against Callahan's liability carriers.

between Farris and Callahan; and (b) those claims alleged in [the arbitration proceeding]." (Doc. 227-15 at 3). The settlement agreement also included a release of Farris's liability insurers, including St. Paul, from "all claims, cross-claims, actions, causes of action, ... damages, costs, attorneys' fees and expenses" incurred by Callahan, USF&G, and Westlake's owner on account of any damages "arising out of any and all of Farris's work for Callahan at the [Westlake Apartments project]". (Doc. 227-15 at 3-4).

After the settlement with Westlake's owner, USF&G was able to recoup approximately $1 million of the settlement amount from other sources. In August 2006, USF&G filed the instant suit, alleging that Liberty breached the CGL policies by failing to defend or indemnify Callahan and seeking to recover the remaining $7 million. For its part, Liberty filed third party claims against a number of the subcontractors on the Westlake Apartments project, including Farris, and their insurers.

**II.     Standards**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

### B.     Choice of law

A federal district court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). In Florida, the rights and obligations of the parties under an insurance policy are governed by contract law, because they arise out of an insurance contract. *Lumbermens Mut. Cas. Co. v. August*, 530 So.2d 293, 295 (Fla. 1988). In determining which state's laws applies to contracts, Florida continues to adhere to the rule of *lex loci contractus*. *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, (Fla. 2006). "That rule, as applied to insurance contracts, provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." *Id.*

### C. Equitable Contribution

Under Florida law, when a person pays more than his or her share of an obligation, the law provides that person the remedy of contribution to obtain payment of the other obligors' share of the obligation. *Desrosiers v. Russell*, 660 So. 2d 396, 398 (Fla. 2d DCA 1995). Equitable contribution exists to prevent one joint obligor from being required to pay more than his share of a common burden, or to prevent one obligor from being unjustly benefitted or enriched at the expense of another. *Lopez v. Lopez*, 90 So. 2d 456, 458 (Fla. 1956). Parties share a common liability and may be subject to equitable contribution if they are either co-obligors or joint tortfeasors, and parties are co-obligors if they are jointly liable or jointly and severally liable on an obligation. *Helmet House Corporation v. Stoddard*, 861 So. 2d 1178, 1180 (4th DCA 2003).

## III. Analysis

In Count XXV of the Second Amended Third Party Complaint, Liberty raises contingent claims for equitable subrogation and equitable contribution against St. Paul. St. Paul argues that the Release bars Liberty's subrogation claim against it. In a previous order (Doc. 280), the Court rejected Liberty's arguments regarding the Release and determined that it barred Liberty's contingent equitable subrogation claim against Farris. The same result necessarily applies with regard to that same claim against St. Paul.

Before assessing the equitable contribution claim, the Court must address a choice of law issue. St. Paul contends that its policies were negotiated and delivered in Ohio, and that therefore, pursuant to the doctrine of *lex loci contractus*, Ohio law applies to their interpretation and to

Liberty's claim for equitable contribution.[3]  However, the doctrine of equitable contribution is grounded on principles of equity and natural justice and not on contract.  *Fletcher v. Anderson*, 616 So. 2d 1201, 1202 (Fla. 2d DCA 1993).  As such, *lex loci contractus* would not apply to the equitable contribution claim itself.  St. Paul offers no other basis for applying foreign law, and thus the Court will apply Florida law to this claim.

According to St. Paul, courts have uniformly held that an insurer must establish three elements to succeed on an equitable contribution claim against another insurer: The insurers must share (1) the same level of obligation (2) on the same risk (3) to the same insured.  *See, e.g.*, *Lexington Ins. Co. v. Allianz Ins. Co.*, 177 Fed. Appx. 572, 573 (9th Cir. 2006).  However, St. Paul has not produced any Florida case law adopting or applying such a standard.  As noted above, Florida courts have used much more general language, holding that equitable contribution is available where the parties share a "common burden," *Lopez* at 458, or "common liability," *Helmet House at* 1180.  Although considerations such as whether the insurers share a common insured may affect the issue of whether they share a common burden, the Court finds no basis under Florida law for requiring Liberty to explicitly demonstrate the existence of these three elements to pursue its contribution claim.

St. Paul does not dispute that Callahan was an additional insured under the St. Paul Policies.  St. Paul argues that it did not share a common burden with Liberty because it (unlike Liberty) insured Callahan only as an additional insured.  St. Paul cites several cases that allegedly

---

[3]St. Paul also contends that Ohio law and Florida law are in accord in regard to equitable contribution.  It appears St. Paul is raising the choice of law issue here solely to avoid a waiver argument later in these proceedings.

-6-

support a finding that no contribution claim is available between the insurers under such circumstances, but all are distinguishable from the situation here. The first such case, *Transcontinental Ins. Co. v. Ins. Co. of the State of Pennsylvania*, 148 Cal. App. 4th 1296, 1304 (Cal.App. 2007), involved a "primary insurer for several subcontractors and the developer (as an 'additional insured')" seeking contribution from the developer's *excess* carrier rather than, as here, the contractor's primary carrier. Obviously, primary and excess carriers have different obligations, one of which ends before the other begins. *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E. 2d 269, 273 (Ill 2004) involved a contribution claim between two subcontractors' insurers. Both insurers' coverage extended to the contractor. However, the first insurer's policy only covered the contractor for damages arising from the work of the first subcontractor, while the second insurer's policy only covered the contractor for damages arising from the work of the second subcontractor. *Id.* Although the insurers shared a common insured (the contractor), the insurers did not have a common obligation for purposes of a contribution claim, because the risks they were insuring against were different.[4] *Id.* at 279-80. The same holds true for the third case cited by St. Paul, *Schal Bovis, Inc. v. Casualty Ins. Co.*, 732 N.E. 2d 1179 (Ill. App. 2000), which involved claims by one subcontractor's insurer against another and was relied on by the court in *Home Ins. Co*: As in *Home Ins. Co.*, each subcontractor's coverage extended to the contractor, but only as to liability

---

[4]In other words, the first insurer was insuring the contractor against the risk that the first subcontractor would cause damage to the contractor, while the second insurer was insuring the contractor against the risk that the second subcontractor would cause damage to the contractor. The *Home Ins. Co.* court also noted that one of the policies provided primary coverage while the other was excess.

arising from the work of that subcontractor.  Because each subcontractor had agreed to insure a separate risk, they did not share a common liability.  *Id.* at 1187.

In the instant case, it appears that both the St. Paul Policies and the Liberty Policies provide coverage to Callahan for liability arising out of the work of Farris.  At least to this extent, Liberty and St. Paul share a common obligation, and Liberty's contingent equitable contribution claim is legally proper.[5]

**IV.     Conclusion**

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED** that  the Motion for Summary Judgment (Doc. 227) filed by Third Party Defendant St. Paul Fire & Marine Insurance Company is **GRANTED IN PART AND DENIED IN PART**.  Summary judgment is granted to St. Paul as to Liberty's equitable subrogation claim and denied as to Liberty's equitable contribution claim.[6]

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 31, 2007.

                                                                                     GREGORY A. PRESNELL
                                                                                     UNITED STATES DISTRICT JUDGE

---

[5]This is not to say that Liberty's equitable contribution claim is necessarily viable in this case.  Before Liberty can seek contribution from third parties, it must incur liability to USF&G/Callahan.  The most likely scenario for this involves a determination that Liberty breached its policy with Callahan.  Although the parties have not briefed the issue, under this scenario, the question becomes whether a non-settling insurer such as Liberty can demand contribution from a settling insurer, particularly when the non-settling insurer did not pay up until forced to do so by a court.  If anything, the equities would seem to lie with the insurer that had *not* been found to have breached its policy.

[6]The parties agree that Liberty's claim for contribution for defense fees and costs has been withdrawn. (Doc. 259 at 16).

Copies furnished to:

Counsel of Record
Unrepresented Party